IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

JUSTIN J. GUMBS,    :

    Petitioner,    :

    v.    :    Case No. _____

DAVID E. ORTIZ, WARDEN;    :
D.K. WHITE, WARDEN,;    :
MS. BLACKWELL, D.T.S./CASE MGR.;    :
ET AL,    :

    Respondent(s)    :

**RECEIVED**

**OCT 10 2019**

AT 8:30_____ M
WILLIAM T. WALSH, CLERK

COMPLAINT FOR DECLARATORY, COMPENSATORY AND PUNITIVE JUDGMENT

If it pleases the Court, NOW COMES, JUSTIN J. GUMBS, Petitioner, pro se, sui juris, in propio, and muto, persona, and in the greater interest, and pursuit, of justice, who respectfully requests, moves, and prays, that this AUGUST Court hold him to less stringent standards than those attributed to a more well-seasoned attorney. HAINES V. KERNER, 404 U.S. 519-21 (1972).

## I. JURISDICTION AND VENUE

1. This is a Civil Action, authorized by, and pursuant to, BIVINS V. SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS, 403 U.S. 388 (1971); 42 U.S.C. § 1983; as well as the Federal Rules of Civil Procedure, to redress the deprivation, under color of State(s), statute(s), regulation(s), of federal law, and of rights secured by the United States Constitution. This Court has the jurisdictional authority, under, and pursuant to, 28 U.S.C. §§ 1331, and

1

1341(a)(3). Venue is proper in the United States District of New Jersey, Camden Division, because, pursuant to 28 U.S.C. §§ 1402(b), and 1391(a)(3), Petitioner resided in this District when the most recent event(s) in question occurred. Petitioner respectfully seeks DECLARATORY, COMPENSATORY, AND PUNITIVE, JUDGMENT RELIEF, pursuant to 28 U.S.C. §§ 2201, and 2202, as well as, SPECIFICALLY, Rule 65, of said Federal Rules of Civil Procedure.

2. United States District Court for the District New Jersey, Camden Division, is an appropriate venue, under, and pursuant to, 28 U.S.C. § 1391(b)(2), because it is where ALL of the most of the event(s) in question, as will be explained, took place; giving rise to these claims.

## II. PETITIONER

3. PETITIONER, JUSTIN J. GUMBS, is, and was, a prisoner, and in custody, of the Federal Bureau of Prisons (B.O.P.), L.S.C.I. Allenwood, White Deer, PA., and is presently a prisoner, and in custody, of F.C.I. Fort Dix, Fort Dix, N.J.

## III. RESPONDENT(S)

4. RESPONDENT, DAVID E. ORTIZ, WARDEN, F.C.I. Fort Dix, Fort Dix, N.J.

5. RESPONDENT, D.K. WHITE, WARDEN, L.S.C.I. Allenwood, White Deer, PA.

6. RESPONDENT, MS. BLACKWELL, D.T.S. (Drug Treatment Specialist)/CASE MANAGER, L.S.C.I. Allenwood, White Deer, PA.

## IV. STATEMENTS OF FACT

7. The instant COMPLAINT is filed for violation of Petitioner's Eighth

2

Amendment right to protection against "...cruel, and unusual, punishment..."

8. In an intentionally elaborate, insidiously covert, highly orchestrated, and concerted, attempt to WRONGLY, and ILLEGALLY, prevent Petitioner from RIGHTFULLY seeking RELIEF, and SATISFACTION, Petitioner strongly asserts, alleges, believes, and contends, that Respondent(s) were, and are, STILL, SHAMELESSLY, trying to discourage, and "play out the clock" on, Petitioner's remaining term of incarceration, by CONTINUALLY DENYING him his rights;  , and will be, described, in the within COMPLAINT.

9. It has, ALWAYS, been staff's primary, and never-ending, focus of attention, obsession, and "MISSION", since Petitioner first entry into the Residential Drug & Abusal Program (R.D.A.P.), on August 14, 2018, to do everything possible to prevent him from successfully completing, and graduating, from the R.D.A.P. The "catch-all", "smoke and mirrors" strategy was notoriously typical, and well known, in the R.D.A.P.

10. It is Petitioner's assertion, belief, and contention, that the Program Statement rules, regulations, and policies, that govern the R.D.A.P., CANNOT BE IN CONTRADICTION to any other B.O.P. Program Statement policy(s). IN FACT, said Program Statement, itself, IS NOT IN CONTRADICTION. The, ONLY, contradiction is staff's renowned "lazy", poorly coordinated, unprofessional, and ILLEGAL, attempts to circumvent, and intentionally misinterpret, other B.O.P. Program Statements; simply for their "benefit", and insatiable desire for "conquest", and "control".

11. It is against Petitioner's, as well as all inmate's, LIBERTY INTEREST(S), and constitutionally-protected Due Process right(s), to be prevented from participating in a drug program that IS NOT a priviledge, but an established right, pursuant to same said Program Statement.

12. As is the "normal, divide and conquer" mentality of all departments

3

within the B.O.P. (R.D.A.P. staff, CERTAINLY, not being the exception), staff has a tendency of "administrating" the R.D.A.P. as if it were their very own little, personal "fiefdom"; making-up the rules as they go along, and as it pleases, and conveniences, them; thwarting any inmate's attempts to successfully participate in any, and all, B.O.P. programs, in sincere attempts of returning back into society a little more sooner, than later.; a fully dollumented, and precedented, "power grab" of dangerous magnitude(s); human nature at its very worse. This, AGAIN, creates a paradox of vagueness, fear, and intimidation, against which the "Vagueness Doctrine" was meant to fully protect.

13. This "epic journey" began on Monday, December 17, 2018, in L.S.C.I. Allenwood, after R.D.A.P. classes in the Chapel were over. Petitioner, and an inmate named "WALKER", were summoned to Respondent Ms. Blackwell's office. She instructed both to sign a "FORMAL WARNING" document (An R.D.A.P. sanction document, not unlike an disciplinary INCIDENT REPORT) for, ALLEGEDLY, handing-in an R.D.A.P. workbook that contained empty, blank boxes that should have been filled-in.

14. Both Petitioner, and inmate "WALKER", asked Respondent Ms. Blackwell that they be allowed to examine said workbook, before signing said "FORMAL WARNING", but claimed that said "...workbook was down in the Unit. She then became extremely agitated, and stated that she "...was overwhelmed with work...being pulled in too many different directions...with too much on my plate as Unit Manager..." She, further, stated that she did not have time to get her work done...did not have time to deal with this..." She continued to insist that we sign said document, and that she would show us the book "...another time..."

15. Both Petitioner, and inmate "WALKER", expressed that they "sympathized" with her about her problems, but reiterated that they "...would feel more comfortabale signing after..." they reviewed it with her. She became extremely

4

defensive, and asked "...Are you calling me a liar?..." They stated that they would just like to examine the workbook in question. She became further annoyed, and stated "...Fine. When we go down to the Unit, you can see the book, then sign the 'FORMAL WARNING'..." She then walked away. Inmate "WALKER" became nervous because Respondent Ms. Blackwell was visibly angry. Inmate "WALKER", immediately, went directly to D.T.S. Mr. Golden, and informed him as to what had just transpired. Inmate "WALKER" was, naturally, afraid of getting into any kind of trouble in the R.D.A.P.

16. Later, when summoned to the front of the Unit by Respondent Ms. Blackwell, to let both review said workbook, both Petitioner, and inmate "WALKER", examined said workbook, and found that NOTHING WAS LEFT BLANK; as Respondent Ms. Blackwell had INCORRECTLY CLAIMED. Petitioner asked her that she, "...Please help me understand what you were referring to as being left blank..." She abruptly took the workbook away from Petitioner, and stated, what sounded like,"...Fuck it. I'm just going to Team the two of you..." "Team" means a formal meeting with Unit Team. She took the workbook, and other papers, and walked away.

17. Petitioner was summoned to the office, and "Teamed" by Respondent Ms. Blackwell, and the other four (4) R.D.A.P. staff members. Petitioner began to explain what had transpired, and that she had stated that she was "overwhelmed", and that she "did not have time to deal with this", etc., etc. She acknowledged that she did, INDEED, state those things. Petitioner then continued with the rest of what she had expressed. Petitioner, then, explained that he heard her say "Fuck it", when she took the workbook back. She, immediately, became very angry, in front of the other four (4) staff members, and began to yell, and shout; shooting-up from her chair, throwing the book she had in her hand on the desk, stating that she "...does not curse...I don't say the 'F' word...". Before Petitioner could respond, I was instructed by staff to step outside for a moment by D.T.S.

Ms. Hanes, so that they "...could calm her down..." Ms. Hanes came out, and instructed Petitioner to "...just go...We can finish the Teaming later..." Petitioner WAS NEVER AFFORDED, NOR ALLOWED, THE OPPORTUNITY to finish said "Team" meeting.

18. Some time later, Petitioner was summoned to the Lieutenant's Office, but, THEN, was RE-DIRECTED to the S.H.U. When interviewed by the Lieutenant in the S.H.U., he passed a 300 Series INCIDENT REPORT to Petitioner through the S.H.U. door. Petitioner asked the Lieutenant why he was being given this INCIDENT REPORT when he had not done anything wrong to warrant this treatment. The Lieutenant stated that he agreed with him, but that he had "...pissed-off Ms. Blackwell..", and that that was why he was placed in the S.H.U.

19. Petitioner was UNFAIRLY placed in the S.H.U. becasue of a GROSS ABUSE of authority, and for RETALIATORY purposes. Even the INCIDENT REPORT was, clearly, retaliatory, and issued out of anger. Officer Galoza, who escorted Petitioner to the S.H.U., advised me, about a week later, that Respondent Ms. Blackwell conveyed to hER that said incident "..wasn't really a big deal...there's no reason to put him in the S.H.U...." The real question remains: If Respondent Ms. Blackwell knew this, why did she continue with this charade, and allow Petitioner to stay in the S.H.U. for so long???

20. While in the S.H.U., Petitioner was ignored, and mistreated, by staff. They refused to give Petitioner any blank Administrative Remedy forms. The cell DID NOT HAVE a proper mattress. It was more like half ($\frac{1}{2}$) a mattress; forced to sleep on metal, with a broken foot, and bone disease. Petitioner requested a proper mattress, for "days on end", and refused. On one of his S.H.U. rounds, the Warden advised me tell my problems to the Captain. Said Captain cut me off, walked away, and responded that "...he did not want to hear it..." It came to my attention that on December 19, 2018, the S.H.U. received eight (8) new

6

mattresses, and was, STILL, not given a replacement.

21. Because of this GROSS, WANTON, and DELIBERATE MEDICAL INDIFFERENCE, and INTENTIONALLY DESPICABLE conduct, by Respondent(s), Petitioner's body is in constant, horrific pain, that even Officer Roher expressed "...I don't give a damn what's wrong with you..." "From the get go" in the S.H.U., Petitioner requested proper medication, and was COMPLETELY IGNORED. Petitioner explained that he could not miss his dosage of chemo pills, but advised him to fill-out a "Cop-Out", which he did, and RECEIVED NO RESPONSE. Officer Hiller allowed him to watch her pack his belongings through the S.H.U. cell window. Petitioner asked for his pills, which were among his belongings. He requested said pills, but retorted that she could not give them to him, and that only a nurse could hand them to him. Petitioner requested a nurse; but WAS NEVER ACCOMADATED. Petitioner WAS NOT DISPENSED his much-needed chemo medication until, almost, the end of two (2) weeks in the S.H.U. Petitioner was in a seriously bad medical condition, which was conveyed to P.A. (Physician's Assistant) Andruizzi; TO NO AVAIL.

22. On Christmas Eve, December 24, 2018, Petitioner suffered an anxiety attack in the S.H.U., and was placed in a different cell. He was MISTREATED by staff for many days after that. Specifically, officer(s) Hiller, and McGloughlin. Officer Hiller put Petitioner into a new cell, with only a cup, a spoon, and a sheet. She came back with some of my pills, and THREW them on the ground through the cell door slot, as they spilled over the filthy floor, next to the toilet. Later, when clean clothing came back from laundry, the officers gave the other inmates their laundry through the cell door slots, but McGloughlin took my cloths, and put back into the bin. Petitioner begged him for his clean cloths, but he simply ignored him, walked away, and left him without a change of cloths.

23. Petitioner was subjected, YET, to further abuse on Christmas Day, 2018, when inmate orderlies allowed us to pick books from the cart. Officer McGloughlin

allowed the other inmates to pick books through the cell door slots; but, when he arrived at my cell, he stated "...You got too much stuff in there, Gumbs. You don't need these books...", and walked away without allowing me any books from the cart. Petitioner begged, and pleaded, with him not to do this on Christmas Day; to have some compassion. He ignored Petitioner. Petitioner asked another officer for assistance. he stated "...I'm not involved..." I was refused soap, toothpaste, or a toothbrush.

24. Petitioner requested his allowed telephone call, which he was supposed to receive within seven (7) days of arriving in the S.H.U.. He was refused his telephone call. He WAS NOT ALLOWED his telephone call until FOURTEEN (14) DAYS after arriving in the S.H.U. Petitioner had been subjected to this kind of "Third (3rd) World" MALTREATMENT, from officer(s) Hiller, and McGloughlin, for his entire stay in the S.H.U. All of this can be verified by examining the video(s), and checking all of the telephone, and medical, records.

25. The purpose of the R.D.A.P. is to give us "tools" to better ourselkves so that we may be successful when being integrated back into society. This, of course CANOT BE ACCOMPLISHED if the D.T.S. indicates that he/she is overwhelmed by his/her job; which was, CLEARLY, expressed by Respondent Ms. Blackwell. This, STILL, does not excuse her actions, and the way she mishandled this sad situation. I DID NOT RECEIVE the help I needed, and was, INSTEAD, ignored, and mistreated, due to her inability, and ineptness.

## V. EXHAUSTION OF ALL LEGAL ADMINISTRATIVE REMEDY(S)

26. Petitioner, JUSTIN J. GUMBS, used the prisoner grievance procedure(s), available at L.S.C.I. Allenwood, and F.C.I. Fort Dix, to try, and solve, the problem, case, and matter, at hand. In EXHIBIT(s) "A" through "F", Petitioner

presented the facts, relating to the instant COMPLAINT, and was sent responses stating that said LEGAL ADMINISTRATIVE REMEDY(s) (prisoner grievances) had been DENIED,: for various, convoluted reasons, "across the board". At every "turn", Petitioner appealed each, and every, DENIAL.

## VI. LEGAL CLAIMS AND CAUSES OF ACTION

27. Petitioner re-asserts, re-alleges, and incorporates, by reference, the within-stated Paragraphs 1 through 30, as is set forth, HEREIN, in full.

28. Petitioner has no plain, adequate, or complete, remedy at law to redress all of the wrongs, as are described, HEREIN. Petitioner has been, and will continue to be, IRREPARABLY INJURED, by the GROSS, and WANTON, conduct of Respondent(s), unless this Court GRANTS Petitioner the DECLARATORY, COMPENSATORY, AND PUNITIVE, RELIEF, which Petitioner respectfully, and earnestly, seeks.

29. In summation, PLEASE NOTE that I have included a CONTINUATION of Administrative Remedy EXHIBIT(s) "G", and "J", regarding the original "NEXUS", and origin, of the instant COMPLAINT, case, and matter, at hand, which began with Respondent Ms. Blackwell's B.O.P. INCIDENT REPORT, and concluding with the DISCIPLINE HEARING OFFICER REPORT (D.H.O.R.).

## VII. PRAYER AND RELIEF

30. WHEREFORE, in the sincere interest, and pursuit, of justice, Petitioner respectfully requests, moves, and prays, that this AUGUST Court ENTER JUDGMENT GRANTING Petitioner the following:

A) A DECLARATION that the acts, and omissions, as are described, HEREIN, violated Petitioner's right(s), under the Constitution, and laws, of the United

9

States, as well as said Program Statement that governs the R.D.A.P., and the INCIDENT REPORT process;

B) That Petitioner be, IMMEDIATELY, RE-ADMITTED, back into the R.D.A.P., AT THE SAME POINT, AND LEVEL, when he was ILLEGALLY EXPELLED;

C) COMPENSATORY DAMAGES, in the amount of $57,750.00 (fifty seven thousand seven hundred fifty U.S. dollars), for 1½ YEARS OF LOST WAGES; based upon Petitioner's ability to earn $38,500.00, per year; having been denied early release for successful completion, and graduation, from the R.D.A.P., THUS, denying Petitioner one (1) year reduction in sentence, and half (½) a year of Halfway House, against each Respondent, both jointly, and severally;

D) PUNITIVE DAMAGES, in the amount of $5,000,000.00 (five million U.S. dollars), for mental, and emotional, pain, anguish, and suffering, against each Respondent, both jointly, and severally;

E) For GENERAL DAMAGES, according to proof;

F) For lost earnings, past, and future;

G) For interest, as is allowed by law;

H) For any, and all, additional, necessary, and proper, RELIEF(S), and SATISFACTION(S), that this Court may deem just, proper, and equitable.

Respectfully submitted, and executed, at F.C.I. Fort Dix, Fort Dix, N.J., Burlington County, on this 30ᵀᴴ day of September, 2019.

JUSTIN J. COMBS

Register No. 49309-048
F.C.I. Fort Dix
P.O. Box 2000
Joint Base MDL, N.J. 08640-5433

10

## CERTIFICATE OF SERVICE

I, JUSTIN J. GUMBS, Petitioner, HEREBY, CERTIFY, under penalty of perjury, that, on this 30TH day of September, 2019, I mailed a true, and accurate, copy of the within instant COMPLAINT FOR DECLARATORY, COMPENSATORY, AND PUNITIVE JUDGMENT, via the U.S. Post Office, first class mail, postage pre-paid, to the following parties:

David E. Ortiz, Warden
Federal Bureau of Prisons
F.C.I. Fort Dix
P.O. Box 38
Joint Base MDL, N.J. 08640

D.K. White, Warden
Federal Bureau of Prisons
L.S.C.I. Allenwood
Route 15
White Deer, PA. 17887

JUSTIN J. GUMBS

Register No. 49309-048
F.C.I. Fort Dix
P.O. Box 2000
Joint Base MDL, N.J. 08640-5433

11